Argument in case number 22-1276, Bunge SA v. Adm International Sarl. Mr. Sims, take a moment whenever you're ready. Where you are, Steve Sims for Bunge. We'll like to argue for 10 and reserve 5. And the court asked to have the parties focus on the Carolyn P case and also on the Acquistole case. Let's start with Carolyn P, a case by a good Oxford grad. Don't know whether he got elevated to master's, but at any rate, Judge Neal. And this is at 1 WLR Weekly Law Reports 567. And this is when Judge Neal is going through his A's, B's, and C's. But here's where the ship meets the water. Right down here at the bottom. P says. Which page are you? This is page 567 of the Weekly Law Reports. I'm in the Lloyd's Law Reports. I don't know if you can direct me. Are you talking about where he lays out the three categories? Yes, sir. The third. Yes. He starts the discussion. The third. Yes. Consideration of these cases. There are three ways. A, liable to B, maybe a train wreck. The rest are three. And then he's got the first way, the second way, the third. And then he starts. Then he quotes from the Richardson case. Yes. And he makes an important distinction between law and equity. Chancery courts, law courts. Admiralty courts have always been courts of equity. They're neither law nor equity. They're a third thing. They're a third thing. Yes. And Admiralty considers equity. And here's what Judge Neal quotes from the Richardson case, which is. Chancery emphasizes a fundamental principle that must be paid before you have a right to indemnity. And I want to put my finger in that because I'm going to come back to it. Because the remedy in equity, what equity gave was a declaration to the right. You could file a bill against the principal debtor to make him pay the debt. So you would not be called to pay it. And then you obtained a declaration that you were entitled to indemnity. So step one, you get security. Step two, you get a declaration that you're entitled to get paid from the security. You could, in certain cases, have a fund set aside in order that you might be indemnified. But right after that, when we finish the block quotation, it seems clear, however, that even in equity, time does not begin to run purposes any limitation period until the liability of the person to be indemnified has been ascertained. That would suggest, okay, maybe you don't actually have to pay the money, but maybe at least you have to have the judgment to pay. Exactly. And that's the distinction here. But there's no judgment yet against you. That's right. The Carolyn P. was about limitations. It was not about whether there was a right of action to have security. Different case. Carolyn P. looked at, well, when did this cause of action accrue? And the court said, it hasn't accrued. You're still in. You can still pursue indemnity. But that seems to bear on what Acquistoli considers, quote, a valid prima facie claim. Maybe it's not just a claim. You have a claim of some sort, but it's contingent. Maybe it doesn't become a valid prima facie claim until it has been ascertained in this way that the Carolyn P. suggests. Well, first, it has been ascertained. Here's why we know that. Because of the charter party. We have a ship owner. We have Bungie, our client. We have the charter party to ADMI. Bungie didn't drive the ship into New Orleans. Bungie didn't choose the terminal. Bungie didn't do anything except say, pay us. As a matter of fact, in the arbitration, it says, you owe us, ADMI, $480,000 plus outside of what the ship owner owes. I do want you to discuss that. Because that is very unclear from the party's briefing, by the way. There are millions of dollars in indemnity here, and we should talk some about is it in this third category, what's the distinction between a contractual liability versus a straight implied indemnity, where that falls. But I also want to hear about the $400,000 plus for loss of hire, I guess it is, and whether that is a contractual claim in the Caroline P. First category, or whether that's also a kind of indemnity. The briefing really did not separate out these possible headings of liability or damages. Second, it's a claim against ADMI. The claim is in the alternative. That is. It's in the alternative if the indemnity fails. If the ship owner is not responsible, if it wasn't a failure of the ship, then it was a problem with ADMI, and ADMI owes the money. ADMI owes the money to Bungie under the charter party, independent of the charter between Bungie and Tongley. In other words, when the ship got messed up in New Orleans, it went off charter, ADMI says, I don't have to pay this stuff. This is the Bungie ship you're talking about. This is the, yes. Bungie is the passive party here. Bungie simply said, here are ADMI, here's the ship, take it to New Orleans. And they did. They chose the terminal. They, so if their choice was wrong, if there was something wrong with the terminal, the ship had been off charter, they owe the money to Bungie. All right. But so you're saying the claim for the loss of hire of 400,000 plus is in the alternative to the claim for a full indemnity. That's correct, Your Honor. If you're not seeking to recover both. Got it. Correct. And back to, back to Judge Neal, then, of course, the Richardson was a, was a 19th century case, not unusual in Admiralty to look at 19th century cases. But then we go forward to a case called Durley House Limited. And this is at 2014 Westlaw 3671611. And this is, this is not a case that's in the, in the briefs. But let me read you. In the future, if you ever choose to bring such a case up at the last minute, you should contact the court and opposing counsel. Have you notified opposing counsel you're going to discuss this case? No, sir. All right. Well, you may discuss it now, but I'm going to give the opposing counsel, you know, each of you can submit a supplemental letter brief in a few days. But it's not in good form if you discover something late not to at least notify. But go ahead. The, the, Justice Morris writes this. He says the position in equity was and is as follows. The indemnified is entitled to a remedy from the indemnifier even if the indemnifier has not paid the creditor. The position is no different even where the indemnifier's obligation is merely one of indemnity and does not include an express obligation to pay the creditor directly. Does that case involve a contingency that might not eventuate? Yes. Okay. Yes. And that the whole point is just like what Rule B is for. Rule B is to secure an eventual liability. In every Rule B case fundamentally you've got an undecided question. Do you have money that's set aside? So let's say, and we did garnish around $420,000 from a, from a counterparty of ADMI. Let's say that, that that garnishment is, is, was held. But at the end of the day, the arbitrators say, Bungie, you don't owe anything to anybody. And ADMI, you don't. Therefore, the money goes back. That's the same thing that happens in, in, in the equitable proceedings in England under this, under the Richardson case, under the, the Caroline C that the Court was discussing or the one I just read. And I'll go on. Another one is Starlight Shipping. Is this, this is another one that's not in your briefs? Another one, yes. And you have not notified opposing counsel? No, sir. Okay. Starlight Shipping. 2011. EWHC 3381, Queens Bench, 2011. And this was a similar Charter Party case where there had not been a final decision in indemnity. And the Court writes, it has equitable jurisdiction to write, to grant quia teamit relief to a party with the benefit of indemnity before the loss is incurred and before there is an equitable right to create and preserve a fund to protect. And, and there is an equitable right to create and preserve a fund to protect the party to indemnify. I haven't read these cases. I don't know whether the facts involve a contingency. Let's assume they do involve a contingency. They could involve something more like a declaratory judgment in, in, in American parlance. Does either of them involve an attachment or a seizure? In a declaratory judgment? I'm asking, did either Durley or Starlake involve authorizing a seizure, which is more than just you have a right to an indemnity at some point, but, and we're going to, we're going to hold on to this ship or asset until then. And that's where we get to the difference between substance and procedure. And U.S. procedure allows a seizure. English procedure would not. Okay. So there may be some interactions here we'll have to consider too. We are at the end of your time. I will, we will have you back up on rebuttal. Mr. Riley, wait, take a moment whenever you're ready. Thank you, Your Honor. You can clarify for me at least the current status of this case. I have a note here that Tongley charters a vessel to Bungie, Bungie subcharters to ADMI. What is the current status? The direct answer, Your Honor, I can tell you this. I called local council in London last week and I said, have there been any  And they said nothing since, since August. And at that point, some briefs have been filed, but no witnesses. They hadn't completed discovery. It's, it is not proceeding. So was a bond posted? Has the vessel gone on its way or? What, what, here they were trying to attach money in the hands of Garnashees. Right. Could you say that again? They were trying to attach money, money assets in the hands of Garnashees in Wilmington, Delaware. But, but it wasn't just garnishment of the funds in the account. All right. So we have. So. Perhaps you could, perhaps you should move on, move on. Caroline P. Obviously an aqua Stoli. We, we asked you to be prepared to discuss. I'm guessing you're probably not prepared to discuss these durly and certainly shipping cases. And we'll give you an opportunity to do that by, by, by letter shortly after. Thank you, Your Honor. You are correct in that, in that assumption. Thank you for that opportunity. I think the appropriate way to do this is to ask, ask a pellet to submit a letter brief by the end of this week. 27th, no more than two single space pages, attaching both cases and explaining its view of them. And then we'll give you a week after that, whatever the date, Friday, February 3rd is to single space pages to discuss both cases. So you'll have a chance for that. But why don't you talk about Caroline P and aqua Stoli, which you've had plenty of chance to prepare on. I may preface that for 90 seconds just to set up who are the parties here. Right. What we have here is that the ship owner chartered the vessel, leased the vessel. Which ship owner? Tongali. Her name is Tongali. There's only one ship owner. Chartered the vessel to Bungie. He chartered to Bungie as a time charter. And this is important. Which sub-charter is it to add me? Sub-charter as a voyage charter. So we have two different documents. And this is important. If I can maybe have an analogy here. If I go to Avis and I rent a car and I rent it for a day or a month, a period of time, that's like a time charter. I drive the car. I park the car wherever I want. I have control of the car. If I go to Uber, it's more like a voyage charter. I ask Uber or a taxi cab company to take me to the federal courthouse in Philadelphia. I tell them where to bring me. And the voyage charter is simply a contract between somebody that has cargo and is asking someone to deliver it somewhere. So in the first case, Bungie can operate the vessel all over the world, globally. In the second case, the sub-charter on the voyage charter is not operating the vessel to that extent. And I mention that because appellant is implying that once Bungie loses, it's kind of a straight pass-through to ADMI. And it's not. There are different documents and many, many issues that come up that would not come up necessarily. Do you agree with Bungie's counsel's description that the main claim here is for the indemnity of several million dollars and that the $400,000-plus loss of hire claim is in the alternative and it would not be a liability for both, one or the other? No, Your Honor. I don't fully understand what he's saying there, but I know that I would agree. Two points. One, actually, there is no claim here. There's no claim. I'm sorry, Your Honor. There's no claim here. They haven't really. Bungie hasn't alleged a claim against ADMI anywhere. You know, I get the impression this case is on hold for some reason. It doesn't seem to be moving. In the arbitration, I could speculate on that, but it would be pure speculation. Well, the arbitrators in London take a long time. They take a while, but I will speculate. What Bungie is trying to do here is to take advantage of the attachment proceedings to set up a more likelihood for a settlement between all the parties. They're not anxious to move ahead in London, and no one's moving ahead in London. Let's move past the speculation. Let's talk about the cases, which we know something about. So what's happened here in London, it's very clear on the record, in London they have only said, we're going to defend the case. Bungie has said we're going to defend against the shipowner. So we're not liable to the shipowner because this happened as a result of the shipowner's errors in navigation or the two anchors fell off. There might be a seawarning issue. So we're not liable to them. Number one. And then, therefore, they would not have any claim against us. But number two, they say, but if we do lose, if we happen to lose for some reason in London, then we will go against ADMI. That's not even alleging a claim. And here, in a First Amendment complaint, they allege that we have or will allege a claim. They have not alleged a claim in the First Amendment complaint. And were not the administrative proceedings, the E4, the provision with the E4 hearing what it is, we would have gone in immediately and moved to dismiss. Failure to state a cause of action. But E4, speed, urgency is important here. E4 lets you get, lets the defendant, whose property has been garnished, get a quick hearing, a matter of days. So you go in for the E4 hearing, which is basically to vacate the maritime attachment. You could argue it would make more sense to just dismiss the claim because nothing has been asserted. It's not only that they haven't even asserted a contingent claim, and we'll get to that, and that's where we start talking about the Caroline P. It's not only that they haven't asserted, just asserted a contingent claim. In fact, all they've said is we have a claim that we may assert someday. They really haven't asserted any claim. So Your Honor, Your Honors have asked about where are we with this Caroline P case. And how that gets into this case is expert counsel on behalf of Bungie filed an affidavit and basically saying that the cases that had been cited in support of the motion to vacate, the Bacchus-Galeri case and the Acquistoli case, English counsel say those cases are wrong. You know, the U.S. cases are wrong. And because here's what the Caroline P says. But the Caroline, I'll admit I have a little trouble understanding what that says. But it does say, you know, there are three scenarios in which an indemnity claim might arise. And they say, you know, with that first scenario, the Caroline P, a cargo of some sort is being delivered to Iraq. When it arrives in Iraq, it's damaged. The receiver brings a claim against the ship owner. The ship owner is trying to get an indemnity from the charterer. Somewhat similar to what we have here. So the, and it's a statute of limitations case, as counsel said. So when did the cause of action arise? Whatever else that case says, it says the cause of action arrives when there's payment. Because of statute of limitations, when does it arise? Does it arise when they enter the contract, the charter party? No. Does it arise when they sign a clause about bills of lending? No. It doesn't arise until the ship owner has to pay the receiver. Okay. But maybe a judgment would satisfy that. It has to pay. You know, there's this point about the way equity treated things being quoted in here. So if there had been a judgment, mightn't that have been enough? The word ascertain, Caroline P., they say ascertain. And even if a judgment had been enough, we don't have a judgment here. There's no judgment against Bungie here. In fact, nothing's happened. Bungie hasn't lost anything yet. So there's no judgment. So if a judgment was enough. That's for an implied indemnity claim. But how about this loss of hire claim? Should we understand that to be a contractual claim, maybe in the first category, where we don't need a judgment perhaps? There is a subtle difference there. But still, all we're left with in defending against that claim, because the burden of proof is to say it's contingent. Right. But the first paragraph in Caroline P., the first way, says the cause of action will date from the date of breach. Has there been – could we conceptualize the loss of hire claim as involving a breach of a contract that's already happened? And here's their problem. It comes back against my first point. They haven't alleged that. And specifically, we have Mr. Rowlinson. He's one of our expert lawyers. The Rowlinson Second Declaration really is what brings us to a close. And that, I think, is rather helpful to you. Yes. And so they have – what they've told the court in – pardon me, the arbitration proceeding in London, and essentially have said the same thing here, is if – he said, we're going to say that, you know, we don't lose that claim. Bunge is saying they win that in London. Then they say, if they lose that, then they'll come against us for the forego. We all contend that it is entitled, yes. Okay, I see what you're saying. This case has really been hanging around for a long time, if I'm correct. Well, it's – And it doesn't seem to be moving anywhere. Correct. You are correct. Now, could you explain the background, what exactly is going on, and why it's actually taking years to move forward? It's not unusual for advocacy cases, I'm sorry to say. But what happened here, there was an accident in the middle of the Mississippi River. Vessels trying to berth or dock. But there's an arbitration going on, isn't there? Yes, and they litigate down there for a while. After the litigation is over – In London. Now, I'm going back to New Orleans. I'm trying to explain why, from the date of the incident, there's been so much delay. And, yes, eventually they get to London, where the owner, who has contributed the settlement, it was a $10 million claim. The owner has paid, let's say, $3 million. And now, in London, they're trying to recover that $3 million by saying, look, if we settle, but you put us – turning to the charterer, turning to Bunke, the owner is saying, but you put us in that position. You sent us to an unsafe berth. And at the moment, the sides have put down their papers, initial papers, and Bunke has said, that's not what we have here. And full stop. Nobody's done anything. No one's called any witnesses. They have very limited discovery. No hearings have been scheduled. So nothing is happening. And – That's the impression I get. Nothing is happening. Nothing is happening. And that's, Your Honor, a very relevant point with attachments as to why the rule that a claim, a contingency claim, should not be sufficient to support a maritime attachment. A maritime attachment is an extreme remedy. It's recognized – it's a necessity to protect defaulting foreigner – to protect defaulting parties against – to protect parties against defaulting foreigners. In the end, it's Tongley who loses the most, isn't it? Right now, Tongley is out $3 million. But we would – if you allow a contingency claim, one of the problems is that our money could be seized, which it was. We've worked most of that out. But our money would be seized, and the case would – might linger in London for an extraordinary amount of time. I do understand there's an arbitration proceeding taking place. In London. That might hopefully bring an end to this? Well, not yet. Eventually, I'm sure. Only eventually. I mean, are you content to let the arbitration proceeding go forward? There's nothing we can do about that. They've come here to get our money to secure a potential loss that they might – secure a potential claim they might have someday against the loss in London, resulting in a loss in London. We have no control over that arbitration. Now, maritime law does allow – you know, things move quickly, ships sail off, funds disappear. So they will allow a plaintiff with a valid maritime claim. A valid maritime claim. That's what – that's what the Acqua Stulte says. That's what that Georgia case, the DHL case down in Georgia, which our district court here relied on very – and the Batticaleira case, which that district court relied – the district court in Georgia, Judge Hall relied on. So the case of – after the Caroline P, we move to the U.S. We move to Acqua Stulte. Acqua Stulte says, we hold that – that's on page 445 of the Acqua Stulte opinion. We hold that to get a maritime attachment, the plaintiff, Bungie, has to do four things. And one of those things is to allege a valid maritime claim. Now, that Acqua Stulte case was citing in approval the Batticaleira case. The Batticaleira case is a district court case, Judge Kaplan, up in New York. He really analyzed in great detail the – I think it's great – the Second Circuit thought it was great detail. He analyzed the Caroline P case, stepped through those three, A, B, and C, those three scenarios. He ruled very similar facts. He said, you can't get a maritime attachment here because you don't have a right to indemnity until you've paid. The Second Circuit approved – affirmed that with a compliment, I will say, to the reasoning. They called it a comprehensive and thorough decision. And then the Georgia court relied on Batticaleira. That brings us back to Batticaleira. I'm just caught up, but we do need to formulate a test. And one of the points from your friend on the other side of some force is, you know, English law doesn't use terms of ripeness. Do we talk about this as just disability or is it that there's not an existing cause of action or there's no payment or judgment? Like, what's the right way to understand this in a way that will work whether we're applying English or non-English law? Because admiralty cases will arise under all kinds of bodies of law. And as they say in Caroline, you know, the cases are not easy to reconcile. And I wouldn't use the word ripe if I could start the world over again. It does sound, you know, mature, I would say. I would say it's not a mature case. It's a remote and immature claim. Is arbitration thought of here? I mean, arbitration. In the U.S.? Well, in Europe and in. Well, in London. In London. But I mean, you want to bring this case to an end at some point. I assume an arbitration is one one way, of course, to bring this. They've started. The bungee and the owner have started an arbitration in London but haven't proceeded with it very far. They've started an arbitration? They've started an arbitration. This is bungee and ADMI? No, no. That's bungee and the vessel owner, Tongley, their start of the arbitration. And in London. But that's being held in abeyance or it's not very active. It's not moving ahead. Meanwhile, they would seek to keep our assets attached here in the States pending an arbitration that we have no control over in London. This has been quite a while, hasn't it? Yes. Thank you. Thank you, Your Honor. Broad paraphrase, I think that the London arbitrators are not slow as we understand slowness. The arbitration is consolidated. ADMI is participating. The anchor links were shipped to England. They were analyzed by a metallurgist. They both all sides have experts. The arbitration is fully engaged going toward London speed. The Paralympian makes clear that in English equity, you don't have to wait for security. You don't have to wait until there's a judgment down the road against a Swiss company. That's what this is, Swiss company. It doesn't make us then crawl through Swiss procedure to try to collect a judgment in Switzerland. It allows us rule B, applying the substantive law of England, which is that you can get a fund in equity to secure a situation that's just like this. I thought that English law didn't provide for attachment in these circumstances. Yes, Your Honor. That's the procedural side of English law. English law doesn't let you, for example, under the Federal Arbitration Act, you can initiate an arbitration with an arrest of a ship in rem. England doesn't recognize in rem and rest for, let's say, the provision of a nonpayment for fuel or, I think, for breach of a charter party. I'm not sure. It doesn't have a rule B procedure. Rule B is unique in the world. United States is the only place that has such a thing. Closest thing in England is called a Moravian injunction, where you have to put up a large bond. Freezing order has nothing to do with it. If you look at Acqua Stoli, that's exactly what the court was arguing against. You don't have to prove that the money's going away. You don't have to prove that the other side. But it's got to be not just a claim, but a valid prima facie claim. Your friend on the other side suggests there's no mature claim here. It's too remote. Is he correct? You have not filed a claim against ADMI anywhere? You just indicate your intention to do so at some point in the future? Oh, there is an active claim as part of the in the arbitration together. So day one, Tongley initiates arbitration against Bungie. Day two, literally, Bungie initiates arbitration against ADMI. The arbitrators put them together. And if the arbitrators say, Bungie, you did it, game over for ADMI. That's it. How long has this been going on? Just curious. This, the initial incident was 2019. Tongley started the arbitration against Bungie. Yes. And then Bungie has an arbitration against ADMI. Yes. But you say game over. And your friend on the other side points out that the voyage charter is a different document from the time charter. How is it game over? There are different responsibilities under the two documents. The responsibility to provide a safe port are exactly the same in both documents. By steering the ship, at least figuratively, to the terminal in New Orleans, ADMI has warranted that it's a safe berth. Interestingly enough, by the way, ARTCO is owned by Archer Daniels, which is owned by, also owns a Swiss company. Okay? So nobody knew, everybody knew where it was going. Everybody knew what the thing was. And here's the, this is the distinction that the carillon P makes. It's one thing, same as rule B. When you set aside money, the money does not go over to the plaintiff until there's a judgment. Same thing as a carillon P. That's what equity does in England, which is what rule B does here, which is to set aside a fund so you don't have to go chasing the entity that really is the primarily liable entity. You have a fund sitting there that will answer it. So you don't have to risk your credit report when you're the person lending the car to the Uber driver. You have the money, so when this arbitration finishes, it is together, there's going to be a single decision. It's not going to be, okay, Tongley, you're innocent, Bungie, you're guilty, and ADMI is guilty. So you say you have presently filed claims in the London arbitration. Do those claims, your friend on the other side there, there was no allegation of a breach of contract. Do those, have you made currently pending allegations of breach of contract? Yes, there are breach of contract. I've got the arbitral demand right here, and what the, let's talk about the $480,000. The $480,000 is money that ADMI has either part of it not paid Bungie because the ship went off charter because of the problems, or because when the ship was off chartered, Bungie becomes responsible for certain port expenses. Is that with subject arbitration as well? Yes, sir. It is. It is. And so here's the dilemma. So there was a lot of, well, you didn't say you were liable. Well, of course we're not going to say we're liable. Because if we say we're liable, then that tags everybody down the line, okay? We're not going to say this failure to pay was your fault. We're going to say it's the ship owner's fault. But in the alternative, you bet. If it's not the ship's fault, it's $480,000 that ADMI had to pay because they steered the ship into an unsafe berth. Is there a provision in the voyage charter, a specific provision you're enforcing with that claim? It's implied in both charters that there is to be a safe port. Okay, neither charter spells this out. You're saying it's an implied term in the contract. Yes, sir. Okay, got it. All right. I think what would be helpful then is, given that you've suddenly kicked up some references to things you're alleging in the – you're out of time, but since you're now raising some specific claims that you're making in the London arbitration that, you know, were not aired and were not provided to this court before, in this letter that's to be due, say, this Friday the 27th at 5 p.m., expand it to three pages, cover the specifics of those arbitration claims, and attach those documents as well as these two cases, the Star Lake shipping and Durley case. And then that will give your friend until a week after that, Friday, February 3rd, I think it is, at 5 p.m., three single-spaced pages likewise, to respond on those three matters. One question. Is timely involved in the arbitration? Yes, sir. All three? They're the ones that are pushing it. They say, Bungie, you did it. We say, we're just in the middle. ADMI should pay if we get – The idea of arbitration is to bring an end to this, isn't it? Exactly. And that's why all the arbitrations are together now. That's why Bungie immediately brought ADMI in, because they're the actively liable party. Liability shouldn't come on Bungie. We didn't make any warranties. What is being sought in the federal court? Excuse me? What is being sought in the federal court? The federal court – It sounds like arbitration is going to be able to take care of all of this in due course. Yes, sir. It's going to take time. Sought in federal court is security for the arbitration. The substance is to be cited by the arbitrators. Security for the arbitration? Yes, sir. In other words, to make sure that it takes place? To make sure that when we get a judgment, we get paid. I see. That we don't have to hold the bag as against Tongley, that ADMI pays. You can't say I blame you for that. Yes. You want to get paid. That's why many people come here, yes. Very good. Thank you. I'd ask that the parties have an order of transcript to be prepared, split the cost equally, and send it into the court to assist the court in preparing its decision. Thank you both. Thank you. Thank you.